# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROSEMARIE KOLODICH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00868** |
| | ) | **Judge Aleta A. Trauger** |
| **SECOND FIDDLE, INC. d/b/a** | ) | |
| **THE SECOND FIDDLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are (1) the Motion in Limine to Exclude Plaintiff's Expert Testimony (Doc. No. 27), filed by defendant Second Fiddle, Inc. d/b/a The Second Fiddle, and (2) the defendant's Motion for Summary Judgment (Doc. No. 28), which is premised, at least in part, on the presumptive exclusion of the plaintiff's expert testimony. As set forth herein, both motions will be denied.

## I.     MOTION TO EXCLUDE

### A.     Facts and Procedural History

Plaintiff Rosemarie Kolodich, who is not a resident of Tennessee, filed suit in the Circuit Court for Davidson County, Tennessee in October 2021. Defendant Second Fiddle, a Tennessee corporation that operates a bar and music venue in downtown Nashville, Tennessee, promptly removed the case to this court on the basis of diversity jurisdiction.

The Complaint asserts a single cause of action for common law negligence against Second Fiddle.[1] The plaintiff alleges that, while she was a patron at the bar operated by the defendant on the evening of October 22, 2020, she slipped and fell because of some liquid on the floor that had been spilled there by other patrons. (Doc. No. 1-3, Complaint ¶¶ 8–10.) She suffered a complex, extremely painful fracture to her left wrist in the fall, for which she ultimately underwent multiple procedures and two surgeries. (*Id.* ¶¶ 14, 19–20.) She alleges that the defendant knew or should have known that the liquid was on the floor, that the wet floor constituted a dangerous condition, that the defendant should have taken steps to remedy the dangerous condition or warn her about it but failed to do so, and that, because it failed to exercise its duty of reasonable care, it is liable to her for the injury and damages she suffered when she fell because of this dangerous condition. (*Id.* ¶¶ 11–17, 21–33.)

An initial Case Management Order governing all important discovery deadlines was entered shortly after the close of pleadings, but most of those deadlines have now been extended, the second time due to the plaintiff's continuing medical problems unrelated to the accident at issue in this case. The most recently entered scheduling order provides for the completion of all written discovery and depositions of fact witnesses by May 3, 2023; the plaintiff's disclosure of experts and production of expert reports by June 9, 2023 and the defendant's by August 11, 2023; the deposition of all experts by October 6, 2023; and the filing of dispositive motions by August 24, 2023. (Doc. No. 20 ¶ 9; Doc. No. 21.)

The plaintiff served her Answer to Defendant's First Set of Interrogatories on June 21, 2022, well before her expert disclosure deadline. (*See* Doc. No. 27-1, at 9.) The defendant's

---

[1] A second defendant originally named in the Complaint has been dismissed without prejudice by Stipulation under Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. (Doc. No. 13.)

Interrogatory No. 9 asked the plaintiff to identify by "name, business address, occupation, qualifications, and nature of expertise any person [she] expect[ed] to call as an expert witness at trial" and to state the subject matter and the substance of the facts and opinions on which the expert was expected to testify," as well as a summary of the grounds for each opinion. (Doc. No. 27-1, at 2.) The plaintiff answered as follows:

> Expert witnesses have not yet been fully determined.
>
> While treating physicians may not need to be disclosed under Rule 26 pursuant to *Alessio v. Crook*, 633 S.W.2d 770 (Tenn. App. 1983), I am disclosing my treating physicians and medical providers listed in response [to] question #12 out of an abundance of caution and shall not be limited to the opinions set forth herein which are formed by such physician because of or growing out of the physician's treatment of me. All experts base their opinions, in part, on their education, training, specialized knowledge and vast experience in their individual fields of expertise.
>
> My treating physicians are expected to give testimony consistent with the medical records, medical bills, and opinions set forth therein regarding my injuries related to the incident that is the subject of this action, including my complaints, plan of treatment, diagnosis, surgical intervention, if any, future medical treatment, permanent injury and reasonableness and necessity of the medical expenses incurred. The subject matter and facts on which the treating physicians are expected to testify are contained in the medical records and medical bills provided with these answers and later supplemented, as necessary. The treating physicians' opinions are based on the providers' education, training, skill, personal knowledge and observations obtained during my course of care and treatment.
>
> This response will be timely supplemented pursuant to Rule 26.05 or in accordance with a scheduling order.

(*Id.* at 2–3.)

The defendant's Interrogatory No. 12 asked the plaintiff to identify all healthcare providers who provided treatment to her at any time within the last ten years, as well as the dates of, and reasons for, treatment. Without identifying the dates of treatment, the plaintiff identified ten different practitioners, three of whom clearly had no involvement in her treatment for the injuries sustained in the October 2020 fall. (*Id.* at 4–5.) The other seven are identified very generally as providing treatment for the frozen shoulder, surgery, physical therapy, pain management, and

unspecified "testing" relating to the October 2020 fall (*Id.*) These interrogatory answers are the only expert disclosures the plaintiff has provided in this case.

The defendant has now filed its Motion in Limine to Exclude Plaintiff's Expert Testimony, in which it argues that (1) the plaintiff's expert disclosures for her treating physicians contained in her interrogatory answers do not satisfy her disclosure obligations under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure and, therefore, that the treating physicians identified therein should not be permitted to testify as experts at all; and (2) assuming that the plaintiff's barebones interrogatory answers qualify as expert disclosures, her treating physicians' testimony must be limited to opinions formed in the course of treatment only. (Doc. No. 27, at 7–9.) The defendant notes, in particular, that the plaintiff was involved in other accidents both before and after the October 2020 accident at issue in this case and argues that her treating physicians should not be permitted to "testify as to any exacerbation of Plaintiff's injuries from any prior accident, nor the implications of any subsequent accident." (*Id.* at 10.)

The defendant further points out that Local Rule 39.02 limits the number of experts a party can identify to three, "absent prior approval of the Court." (*Id.* at 10 (quoting M.D. Tenn. R. 39.01(c)(5)(A)).) It argues that, because the plaintiff has "never narrowed down her list of "[fourteen] possible expert witnesses,"[2] identified "almost [five] times the number of experts allowed," and "failed to obtain prior approval from the court" for more than three, she should not be permitted to offer expert testimony at all. (*Id.* at 10–11.)

Finally, the defendant argues that it has been prejudiced by the plaintiff's failures to comply with the federal and local rules.

---

[2] The defendant exaggerates somewhat. The plaintiff identified four facilities and ten individuals, not fourteen individual experts. And only seven of the individuals are identified as having information relating to the injury at issue here.

The plaintiff responds that (1) her answers to written discovery satisfy her disclosure requirements for treating physicians under Rule 26(a)(2)(C); and (2) her treating physicians' testimony in the form of opinions relating to causation will be "limited to opinions formed in the course of treatment." (Doc. No. 31, at 5.) Regarding the number of experts disclosed, she expressly states that she actually intends to call only three of her identified treating physicians to testify at trial: Dr. Anastassia Newbury, Dr. Farooq Qureshi and Dr. Daniel Cohen. (*Id.* at 3.) In addition, however, she argues that Local Rule 39.01 limits to three the number of experts testifying "as to any subject." *See* M.D. Tenn. R. 39.01(c)(5)(A). She states that, of the three she seeks to have testify, one is the surgeon who performed surgery on her left wrist/hand, one is her "treating spine and shoulder/pain doctor," and the last is a "shoulder doctor." (Doc. No. 31, at 6.) She argues that, because she does not intend to offer more than three testifying physicians as to any subject, the defendant's argument under Local Rule 39.01 is moot. Finally, she denies that the defendant has suffered any prejudice, particularly because she supplemented her disclosures with up-to-date medical records well before the supplementation deadline, such that the defendant has all the information it needs to depose her experts effectively.

### B. Legal Standards

Federal Rule of Civil Procedure 26(a)(2) governs expert disclosures. It provides generally that any party must disclose the identity of any witness the party may use to present opinion evidence by an expert witness under Federal Rule of Evidence 702, 703, or 705. Fed. R. Civ. P. 26(a)(2)(A). For any expert disclosed pursuant to Rule 26(a)(2)(A) who is not "retained or specially employed" and who, therefore, is not required to provide an expert report under Rule 26(a)(2)(B), the expert disclosure required by Rule 26(a)(2)(A) must state:

> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

(ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C).

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

### C.      Whether the Plaintiff's Treating Physicians' Testimony Must Be Excluded

The law is clear that a witness who is "retained or specially employed to provide expert testimony in the case" must provide a written report containing certain required disclosures. Fed. R. Civ. P. 26(a)(2)(B). However, for witnesses who are not required to file a written report, a disclosure must simply be made in accordance with the less onerous disclosure standard in Rule 26(a)(2)(C). A treating physician is generally exempt from the written report requirement for expert testimony. *See Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007) ("[A] treating physician . . . can be deposed or called to testify at trial without any requirement for a written report." (quoting Fed. R. Civ. P. 26(a), cmt. 1993 Amendments, subdivision (a), para. (2)). Accordingly, as both parties recognize, the plaintiff was not required to provide an expert report for her treating physicians.

As set forth above, Rule 26(a)(2)(C) requires that a disclosure from a non-retained expert, such as a treating physician, state only "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." In this case, the court finds that the interrogatory answers in combination with the cross-referenced medical records and medical bills basically satisfied the plaintiff's disclosure obligation under Rule 26(a)(2)(C). In response to the request to identify all expert witnesses she expected to testify at trial, while noting that she had not

"fully determined" expert witnesses, she nonetheless identified and "disclosed" the treating physicians and other medical providers listed in her answer to Interrogatory No. 12.[3] In addition, the subject matter of each expert's testimony is readily identifiable by the practitioner's treatment area. For instance, "Dr. Anastassia Newbury," who performed "surgery as a result of the accident" (Doc. No. 27-1, at 4), would obviously be anticipated to testify about the surgeries she performed on the plaintiff's left wrist/hand after the October 2020 fall. Similarly, Dr. Daniel Cohen treated her "shoulder," and Dr. Qureshi provided "pain management for shoulder and neck." (Doc. No. 27-1, at 4.) The plaintiff also identified these practitioners' medical records and medical bills as containing the substance of the facts and opinions to which they were expected to testify, and she states that her medical records and bills were produced as part of her Rule 26 initial disclosures in March 2022 as well as in response to the defendant's Requests for Production of Documents. She states that she supplemented these records in February 2023. (Doc. No. 31, at 5.). The defendant does not complain that it has not had access to the plaintiff's treatment records, nor does it indicate that these records are so voluminous that the plaintiff's reference to them as incorporating the facts and opinions as to which her treating physicians are expected to testify is unreasonable.[4]

Moreover, to the extent that the plaintiff's disclosures did not strictly comply with Rule 26(a)(2)(C), the defendant's cursory assertion of prejudice is not persuasive. The defendant clearly had all the information it needed to determine which of the plaintiff's experts had information relevant to the injuries at issue in this case and whether to depose them. Moreover, regarding

---

[3] The plaintiff's reference to *Alessio v. Crook*, 633 S.W.2d 770 (Tenn. Ct. App. 1983), is confusing, and her suggestion that treating physicians "may not need to be disclosed under Rule 26" based on that case is simply incorrect, at least in federal court.

[4] Certainly, at trial, to the extent the plaintiff's practitioners' testimony exceeds the scope of their written records, the defendant will have a basis for seeking to exclude such testimony. *See* M.D. Tenn. R. 39.01(c)(5)(C) ("Expert witnesses may not testify beyond the scope of their expert witness disclosure statement.").

numerosity, the Local Rule to which the defendant points governs "trial procedures" and limits, not the number of experts a party may disclose, but the number a party may call to testify at trial, and the plaintiff has clarified, well within the deadline for expert depositions, that she intends to call three of her treating practitioners to be witnesses at trial.

Finally, regarding the scope of the treating physicians' testimony, the defendant is correct, as the plaintiff concedes, that a treating physician who has not produced an expert report may not offer any opinions formed in anticipation of litigation or, indeed, formed outside the scope of the treatment relationship. *Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 810–11 (6th Cir. 2005) (finding that the trial court did not abuse its discretion in excluding that part of a treating physician's opinion on the cause of the plaintiff's injury, insofar as the causation opinion was based on a video of the accident, rather than the examination and treatment of the plaintiff, and was formed months after the accident, rather than at the time the physician treated the plaintiff). At the same time, however, "[i]t is within the normal range of duties for a health care provider to develop opinions regarding causation and prognosis during the ordinary course of an examination." *Fielden*, 482 F.3d at 870 (quoting *Martin v. CSX Transp., Inc.*, 215 F.R.D. 554, 557 (S.D. Ind. 2003)). As the Sixth Circuit noted in *Fielden*, "[t]he determinative issue is the scope of the proposed testimony," and a treating physician will be exempt from the Rule 26(a)(2)(B) expert report requirement only so long as the "treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden*, 482 F.3d at 871.

The plaintiff here represents that her three testifying treating physicians "do not intend to testify beyond the scope of their personal knowledge or opinions contained within their medical records, or render an opinion formed in anticipation of litigation as a treating physician." (Doc.

No. 31, at 5.) Under *Fielden*, their testimony will be admissible so long as it stays within the range of what the treating physicians learned through treating the plaintiff.

In sum, because the plaintiff's treating physicians were adequately disclosed as expert treating physicians under Rule 26(a)(2)(A) and (C), and they intend to testify within the scope of their personal observations, diagnosis, and treatment of the plaintiff while she was actually in their care, the defendant's Motion in Limine will be denied, but without prejudice to the defendant's ability to object at trial to the introduction of any testimony that exceeds that scope.[5]

## II.    MOTION FOR SUMMARY JUDGMENT

The defendant moves for summary judgment on the plaintiff's negligence claim on the basis that (1) the plaintiff cannot meet her burden of proving that Second Fiddle "created, caused, or had actual or constructive notice of the allegedly dangerous condition" before the plaintiff's fall (Doc. No. 29, at 5); and (2) if its Motion in Limine is granted, the plaintiff lacks medical proof required to establish causation (*id.* at 14).

### A.    Undisputed Facts[6]

#### 1.    *The Fall*

The plaintiff, who then resided in Pennsylvania and Maryland, visited her friend Julia Lang in Nashville in October 2020. The day she arrived in Nashville, the two went downtown in the late afternoon. After having spent some time at several other establishments on Lower Broadway, they

---

[5] As indicated above, the deadline for deposing experts expired on October 6, 2023, while the defendant's Motion in Limine was pending. If the parties delayed expert depositions in anticipation of a ruling on this motion, the court will be willing to entertain a motion to extend that deadline.

[6] The background facts for which no citation is provided are drawn from the pleadings or the plaintiff's Response to the Defendant's Statement of Undisputed Material Facts. All facts set forth herein are either undisputed for purposes of the Motion for Summary Judgment or viewed in the light most favorable to the plaintiff.

eventually ended up at the Second Fiddle, the bar operated by the defendant. It was dark by that time. (Doc. No. 38-1, Kolodich Dep. 34.)[7]

After ordering drinks at the bar, the plaintiff and Lang sat down at a high-top table. At some point, a group of people they did not know came up to their table. One of the individuals with that group knocked over a drink on the plaintiff's table. The plaintiff confirmed that the glass that spilled was in the middle of the table, and she did not see it spill anywhere besides the table. (Kolodich Dep. 42 (confirming that "[i]t was very dark in there" and she could not see if any liquid spilled onto the floor).) No liquid spilled on her, and she was not aware of any other people complaining that it spilled on them. (*Id.*) She got a bar towel from the bartender to wipe the table down. (*Id.*)

Julia Lang testified that her memory was "fuzzy," but she recalled that Kolodich asked a female employee walking by for a towel, and that is how they got the bar towel. (Doc. No. 38-2, Lang Dep. 31, 35.) According to Lang, their table was very small, and whatever spilled "covered the entire table" and was "running off the sides. It was everywhere." (Lang Dep. 34.) She claimed that she knew liquid ran off the table, because it was a small table and a large drink. (*Id.* at 43.) However, none of it spilled on her, and she did not see any liquid on the floor on her side of the table. (*Id.* at 37.) Asked whether any Second Fiddle employee was aware of the spill, she responded, "I don't know how [they] couldn't. I mean, the bouncer was right there." (*Id.* at 33.) In addition, because they had to ask for a towel, she presumed the employee they asked should have known there was a spill. (*See id.* at 36 ("I mean, why else would [Kolodich] need a towel[?]").)

---

[7] The original deposition transcript pagination for both Kolodich's and Lang's depositions is inconsistent with the pagination assigned by the court's electronic filing system, because they include unnumbered title pages. The court employs the original transcript pagination.

Because the people who kept encroaching on their table were very intoxicated and generally making them uncomfortable, Lang and the plaintiff decided to leave. (Kolodich Dep. 46.) The plaintiff told her friend, "I'm going to the bathroom, why don't you get the check." (Kolodich Dep. 46.) Kolodich stood up, walked to the bathroom, returned to their table, and sat down and pulled her chair in. (Kolodich Dep. 47.) Lang, at that point, got up to pay the check and also go to the bathroom before they left. (*See* Lang Dep. 36–37.) Lang did not see what happened at their table after this point. (*Id.*)

The plaintiff testified that the "drunk girl" with the annoying group of people came over and was standing near their table again. (Kolodich Dep. 47.) As the plaintiff explained it:

> I stood up off my chair.
>
> It wasn't a big table. It was like a little high-top thingy. I reached over and I said, you need to go sit down. I'm not trying to get kicked out of here, I just got to Nashville.
>
> And I went to sit back down on my chair, and . . . when I sat down, it slipped out from under me and I went down this way (indicating) to brace myself and I fell.
>
> When I say "this way," I'm sorry, I mean to my left.

(Kolodich Dep. 47.) She clarified that, when she stood up, she was "leaning over the table," and then, when she sat down, she had her "hands on the table." (*Id.* at 48.) She also noted that it was not a big table, and she is not a tall person. When she went to sit back down, she did not "lean back"; instead, she said,

> my thighs were on the back of the chair, and it slipped out when – again, my legs would not touch the ground when I was sitting because I'm short and it's a high-top. . . .
>
> I felt the whole chair go back, yeah, and it, like, . . . tipped out . . . . Like, it pushed out on me.

(*Id.* at 49.) The chair slid out behind her to her right, and she fell to her left, putting down her left hand to catch herself. (*Id.*) She felt something in her arm "snap." (*Id.* at 50.)

Asked how she knew the floor was wet, she explained that she was wearing a light shawl that evening. After she got up off the floor, having heard her arm snap, she wrapped the shawl around her arm to support it and realized the shawl was wet. (*Id.*) The shawl was not wet before that, so she assumed that the floor was wet. (*Id.*) She knew her arm was broken, and she was immediately in excruciating pain. (*Id.* at 59.) She and Lang left immediately, without "complet[ing] any type of report or anything at the Second Fiddle." (*Id.* at 56.) They were able to get a cab immediately outside the bar, which took them to the Ascension St. Thomas Emergency Department. (Kolodich Dep. 57–60.)

Desi Thompson was employed by the defendant and working at the Second Fiddle as a General Manager and bartender on October 22, 2020, the night of the plaintiff's fall. (Doc. No. 28-3, Thompson Aff. ¶¶ 2, 3.) Kevin Harding was employed by the defendant and working as a barback on the night of the fall. (Doc. No. 28-4, Harding Aff. ¶ 3.) Both aver that no customer, employee or other individual told either of them that night that liquid had spilled onto the floor of the establishment and that they were never put on notice of any kind that liquid had spilled onto the floor. (Thompson Aff. ¶ 4; Harding Aff. ¶ 4.) They both also state that it was standard practice for all employees at the Second Fiddle to monitor the premises for spills or liquids throughout their shifts and that they monitored the premises for spills throughout that night. (Thompson Aff. ¶ 5; Harding Aff. ¶ 5.) Both state that, despite monitoring, they did not see any spills or liquid on the floor. (Thompson Aff. ¶ 5; Harding Aff. ¶ 5.)

In support of its Reply, Second Fiddle filed the Affidavit of its Business Records Custodian, with an attached written statement by Taylor Collins, the female bartender on duty when the plaintiff's accident occurred. In this unsworn statement, purportedly taken at or near the time of the plaintiff's fall, Collins states only: "Throughout that whole day [October 22, 2020], I

never saw anyone fall or get hurt and no one had brought any incident of any kind to my attention." (Doc. No. 39-1, at 3.) Second Fiddle also produced the Affidavit of Joshua Berry, who was the doorman at Second Fiddle on October 22, 2020. Berry was tasked with greeting patrons as they entered the premises and checking IDs. It is disputed in the record whether the doorman was the same person as the "bouncer" to whom the plaintiff and Lang referred. The defendant asserts that the individual working as a doorman is the person whom the plaintiff and Lang called the bouncer (Doc. No. 39, at 3), but Lang testified that the "guy sitting at the door . . . checking ID's" was not the same as the bouncer. (Lang Dep. 33.) In any event, Berry, as the person checking IDs, avers that he does not recall being told by any customer, employee, or other individual that there had been a spill, does not recall being put on notice of a spill, and does not recall seeing any liquid on the floor of the premises the night of October 22, 2020. (Doc. No. 39-2, Berry Aff. ¶¶ 5–6.)

    2.    *Damages*

The plaintiff was involved in prior accidents in which her left wrist or arm was injured prior to the October 22, 2020 fall, none of which caused lasting problems. (*See* Kolodich Dep. 89–91.) She was also injured in a bike accident in May 2021, just as she was ready to be released to go back to work, in which she suffered a number of injuries, including broken ribs, a fractured left shoulder, and a cartilage tear in her left hip, and she reinjured the "tendon sheath" in her left wrist, on which she had just had surgery in March 2021. (*Id.* at 73, 82–83.),

**B.    Standard of Review**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). Any affidavits or declarations on which either party relies "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In reviewing a summary judgment motion, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility

judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

### C. Discussion

#### 1. Tennessee Law: Negligence and Premises Liability

Neither party disputes that the plaintiff's claim in this diversity action is governed by Tennessee law. And, under Tennessee law, to maintain a claim for premises liability, "a plaintiff must present *prima facie* evidence of the customary elements of negligence." *Est. of Smith v. Highland Cove Apartments, LLC*, 670 S.W.3d 305, 313 (Tenn. Ct. App. 2023), *appeal denied* (May 10, 2023). The elements of a negligence claim are (1) a duty of care owed by the defendant to the plaintiff; (2) breach of that duty; (3) injury; and both (4) causation in fact; and (5) proximate, or legal cause. *Id.* (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).

It is well established that the owner or occupier of land has a duty to exercise reasonable care with regard to invitees on the premises, which includes the duty to remove or warn against "any dangerous condition on the premises of which the property owner is actually aware or should be aware through the exercise of reasonable diligence." *Id.* (quoting *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 716 (Tenn. Ct. App. 2019). Thus, to prove a breach of the duty of reasonable care in the premises liability context, a plaintiff must first prove that a "dangerous or defective condition" existed on the premises. *Id.* (citing *Nee v. Big Creek Partners*, 106 S.W.3d 650, 653 (Tenn. Ct. App. 2002)). In addition, the plaintiff must prove either that the condition was caused or created by the owner, operator, or his agent or that the owner or operator had actual or constructive notice that the condition existed prior to the accident. *Id.*; *Blair v. W. Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004).

*2.     The Plaintiff's Prima Facie Case*

Second Fiddle argues that the plaintiff cannot establish that it breached its duty of care, because she cannot show that a dangerous condition actually existed or that Second Fiddle caused the condition or had actual or constructive knowledge of such condition. It also argues that the plaintiff cannot prove causation.

*3.     Whether a Dangerous Condition Existed*

The plaintiff's testimony that she knew the floor was wet because her shawl was wet after her fall and it was not wet before she fell is sufficient to create a material factual dispute as to whether the floor around where she fell was wet. (Kolodich Dep. 50.) Likewise, Julia Lang's testimony that the drink that spilled on the table was running onto the floor (Lang Dep. 34) is sufficient to give rise to a question of fact as to whether there was liquid on the floor. The fact that neither actually saw liquid on the floor does not contradict that testimony, as both testified that the bar was very dark and it was not possible to see the floor clearly.

The defendant's attempt to analogize this case to *Padgett v. Wal-Mart Stores East, L.P.*, 731 F. App'x 397 (6th Cir. 2018), is futile. In *Padgett*, the defendant did not know at the time he fell what caused him to fall but speculated during his deposition that there must have been "something damp on the floor." *Padgett*, 731 F. App'x at 399. However, he never saw anything on the floor, described the area where he fell as "clean," and testified multiple times that he never saw or felt a foreign substance on the floor. *Id.* Although he also noticed a wet spot on his pants and speculated that it came from a wet spot on the floor, he did not notice the spot until after he was placed on a stretcher. Under these circumstances, the court found that it was simply speculation to conclude that the wet spot on the plaintiff's pants came from liquid on the bathroom floor, when it was equally likely that EMS personnel had spilled something on him.

To be sure, "[w]hen there is a complete absence of proof as to when and how [a] dangerous condition came about, it is improper to permit the jury to speculate on these vital elements" of a premises liability case. *Beckwith v. Wal-Mart Stores E., L.P.*, 112 F. Supp. 3d 724, 731 (W.D. Tenn. 2015) (quoting *Ogle v. Winn-Dixie Greenville, Inc.*, 919 S.W.2d 45, 46 (Tenn. Ct. App. 1995). Here, the evidence offered by the plaintiff is sufficient to give rise to a reasonable inference that the floor around their table, at least on the plaintiff's side of it, was wet. The defendant does not contend that a wet spot on the floor would *not* qualify as a dangerous condition. At this point in the proceedings, the plaintiff has presented sufficient proof of the existence of a dangerous condition.

### 4. Actual or Constructive Knowledge of the Condition

The plaintiff does not contend that Second Fiddle created the dangerous condition. The only question is whether it had actual or constructive knowledge of the existence of that dangerous condition. Regarding the actual knowledge element of the plaintiff's claim, the defendant contends that the plaintiff does not offer proof that she or Julia Lang actually told anyone that the floor was wet or that there had been a spill and that they can only speculate as to whether some employee saw liquid spill on the floor. It points to the testimony of Desi Thompson and Kevin Harding that they were not aware of and did not see any liquids or spills and that they monitored the premises for spills. The defendant also argues that the plaintiff cannot prove constructive knowledge, because she offers no evidence as to how long the wet spot was on the floor before she fell.

The court finds that the plaintiff's evidence is sufficient to establish at least a question of fact as to constructive knowledge of a spill—and liquid on the floor—on the part of the Second Fiddle. First, according to Lang, the employee from whom they got the towel would have been able to see the liquid on the table and running off the table. As Lang points out, why else would they have asked for a towel, if not to clean up a spill? At the very least, the employee who provided

the bar towel had an obligation to inquire why they needed a towel and at least arguably had a reasonable obligation to follow up to make sure that nothing had spilled on the floor.[8] In addition, Lang testified that the bouncer was sitting close enough to their table that she believed he had to have seen the spill. (*See* Lang Dep. 33 ("And the bouncer was looking in our direction the whole time, because he kept yelling at these people. So I don't know how he couldn't have seen it.").)

The plaintiff's evidence is not strong, but it is sufficient to give rise to a material factual dispute as to whether the defendant had constructive knowledge of the spill and liquid on the floor.

### 5. *Causation and Damages*

The defendant also maintains that it is entitled to summary judgment, because, without expert testimony, the plaintiff cannot prove causation. The defendant does not specify what, exactly, it means by causation (whether proximate cause or cause in fact), nor does it distinguish between the different elements of damages the plaintiff claims to have been caused by the October 2020 fall at the Second Fiddle. Regardless, as set forth above, the court will deny the defendant's Motion in Limine to Exclude Expert Testimony, which effectively moots the defendant's argument for summary judgment on this basis.[9]

---

[8] The defendant does not refute this testimony. While the plaintiff and Lang both describe interacting with a female employee, the written statement from Taylor Collins, the female employee on duty that night, addresses only whether she was aware of a fall or other incident that night, not whether she was aware of, or had reason to be aware of, a spill.

[9] In addition, the plaintiff herself is competent to testify that she hurt her wrist in the fall and endured pain and suffering and medical expenses as a result. *Accord, e.g.*, *Ferguson v. Wal-Mart Stores E., L.P.*, No. 2:10-CV-245, 2011 WL 3739157, at \*5 (E.D. Tenn. Aug. 24, 2011) ("Plaintiff has put forward evidence her fall caused *some* injury, even if only the short-term pain and medical expenses associated with Plaintiff's immediate visit to the Emergency Room. This is sufficient to support the causation element of Plaintiff's negligence action . . . .").

As set forth above, to the extent the plaintiff's experts attempt to testify beyond the scope of the medical opinions revealed in their records, the defendant will have a basis for objecting. But it does not, at this juncture, have a viable basis for summary judgment.

## III. CONCLUSION

For the reasons set forth herein, the defendant's Motion in Limine (Doc. No. 27) and its Motion for Summary Judgment (Doc. No. 28) will both be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge